BATTERIES PLUS, LLC, Plaintiff-Appellant,†

v.

Clinton MOHR, Defendant-Respondent.

Court of Appeals

*No. 99–1319. Submitted on briefs April 25, 2000.—Decided June 7, 2000.*

## 2000 WI App 153

(Also reported in 615 N.W.2d 196.)

†Petition to review granted.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Roger Pettit* of *Petrie & Stocking, S.C*, Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Richard R. Grant* of *Consigny, Andrews, Hemming & Grant, S.C.*, Janesville.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. Batteries Plus, LLC (BP) brings this appeal after a jury found that its discharge of Clinton Mohr violated the public policy prohibiting an employer from extracting repayment of expenses from employees by means of economic duress. BP con-

tends that Mohr's discharge was lawful and did not violate any public policy. We reject BP's argument. The evidence is sufficient to support the jury's conclusion that BP wrongfully discharged Mohr when he refused to acquiesce to the demand that he reimburse BP for $11,449.88 paid to him for expenses incurred during his employment.

¶ 2.    BP also complains that the trial court erred in giving Mohr double costs and interest under WIS. STAT. § 807.01(3) (1997–98).[1] It insists that a lump sum offer of settlement from Mohr was lacking the specificity required to permit it to properly evaluate the offer as it impacted Mohr's three different causes of action, each with a different method for the calculation of damages. We also reject this argument. The lump sum offer to settle Mohr's three causes of action provided BP with a fair opportunity to evaluate its liability to Mohr. Therefore, we affirm the judgment in its entirety.

### Procedural Background

¶ 3.    This case arises out of an employer-employee relationship between BP and Mohr. After selling his battery business to BP in 1993, Mohr was initially employed by BP as a store manager. In 1994, at his request, Mohr's job was changed to that of a commercial sales specialist. Mohr's compensation package included a base salary and a commission of a percentage of the gross profits on all sales. In addition, because Mohr was required to use his own vehicle, he was to receive mileage reimbursement. In 1996, BP informed Mohr that he had been paid his mileage reimbursement by mistake and demanded that he sign a note to

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

reimburse BP for the payments in the form of regular deductions from his future pay. Mohr refused to agree to reimburse BP, and when he appeared for work on July 1, 1996, he was told that he no longer had a job with BP. BP commenced this action against Mohr to recover $11,449.88 in alleged overpayment of expense reimbursements. Mohr counterclaimed, asserting claims for breach of an employment contract, wrongful discharge and a violation of WIS. STAT. ch. 109.[2]

¶ 4.  After a jury trial, a verdict was returned finding that BP had not overpaid Mohr under the existing compensation program. The jury concluded that Mohr was entitled to unpaid wages. Finally, the jury found that Mohr was an at-will employee, that he had been wrongfully discharged and that he was entitled to $60,000 in damages.

¶ 5.  In motions after verdict, BP sought to have the court change the jury's answers on the grounds that there was "insufficient evidence to sustain the answers to those questions." In the alternative, BP sought (1) judgment notwithstanding the verdict on the questions relating to the wrongful discharge of Mohr, or (2) a new trial on its collection claim and Mohr's claim for unpaid wages. The trial court denied all of BP's motions. The trial court entered judgment in Mohr's favor, reducing Mohr's unpaid wages claim from $3400 to $137, allowing a fifty percent civil penalty under WIS. STAT. § 109.11(2), allowing double costs and interest under WIS. STAT. § 807.01(3), and denying actual costs and attorney fees under WIS. STAT. § 109.03(6). BP appeals from the order disposing of its motions and judgment.

---

[2] By stipulation, two tort claims Mohr asserted were dismissed.

## Standard of Review

¶ 6.  BP advocates for the application of a de novo standard of review. Its position is that the issues on appeal involve our application of law to essentially undisputed facts and reasonable inferences that can be drawn from documents. BP cites *Vocational, Technical & Adult Education, District 13 v. DILHR*, 76 Wis. 2d 230, 251 N.W.2d 41 (1977), and other cases, for the proposition that "where only one inference can be drawn from the facts, in situations involving undisputed or stipulated facts, and in situations where the meaning of a written instrument is involved, questions of law are presented." BP's argument ignores an important detail: judgment was entered upon the jury's verdict, which was approved by the trial court when the trial court denied BP's motions challenging the sufficiency of the evidence.

¶ 7.  Our standard of review is not as simple as BP contends. The first issue that we address is whether, as a matter of law, Mohr identified a fundamental and well-defined public policy. *See Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 110, 579 N.W.2d 217 (1998). This issue is a question of law, *see Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573–74, 335 N.W.2d 834 (1983), that we review de novo, *see Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 24, 483 N.W.2d 211 (1992). Mohr bears the burden of proving that the dismissal violates a clear mandate of public policy. *See Brockmeyer*, 113 Wis. 2d at 574.

¶ 8.  The second issue we address is whether Mohr was an employee at-will and was discharged for refusing to act contrary to a fundamental and well-defined public policy. *See Kempfer v. Automated Fin-*

*ishing, Inc.*, 211 Wis. 2d 100, 114, 564 N.W.2d 692 (1997). This issue requires us to review the jury verdict from the perspective of whether there is any credible evidence that, under any reasonable view, supports the jury finding. *See id.* The credibility of witnesses and the weight to be given their testimony are left to the jury. *See Weyenberg Shoe Mfg. Co. v. Seidl,* 140 Wis. 2d 373, 380, 410 N.W.2d 604 (Ct. App. 1987). If more than one reasonable inference may be drawn from the evidence, we must accept the inference drawn by the jury. *See id.* We search for credible evidence to sustain the jury's verdict, not for evidence to sustain a verdict the jury could have reached, but did not. *See id.* We view the evidence in the light most favorable to the verdict, *see Kempfer,* 211 Wis. 2d at 114, and we indulge in every presumption in support of the verdict, particularly where the verdict has the circuit court's approval, *see Weyenberg Shoe,* 140 Wis. 2d at 380. We are mindful of the circuit court's advantage over this court in assessing the impact of the evidence. *See State v. Hagen,* 181 Wis. 2d 934, 949, 512 N.W.2d 180 (Ct. App. 1994).

¶ 9.   The third issue we address, whether Mohr is entitled to double costs and interest, requires the application of WIS. STAT. § 807.01(3) and (4). Applying a statute to a set of facts is a question of law that this court reviews de novo. *See State ex rel. Badke v. Village Bd.,* 173 Wis. 2d 553, 569, 494 N.W.2d 408 (1993).

### *Discussion*

#### *1.  Wrongful Discharge*

¶ 10.   We will first consider whether Mohr has met his burden of identifying a fundamental and well-defined public policy that was violated when his

employment with BP was terminated. Mohr points to WIS. STAT. § 103.455 and *Wandry v. Bull's Eye Credit Union,* 129 Wis. 2d 37, 384 N.W.2d 325 (1986), as establishing a "fundamental and well-defined public policy proscribing economic coercion by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's careless-ness, negligence, or wilful misconduct."[3] *Id.* at 47. BP counters that the statute does not permit an employee to keep money paid to him or her by mistake or forbid an employer from seeking reimbursement.

¶ 11.   Wisconsin subscribes to the at-will employ-ment doctrine. "The doctrine recognized that where an employment was for an indefinite term, an employer

---

[3] WISCONSIN STAT. § 103.455 provides:

No employer may make any deduction from the wages due or earned by any employe, who is not an independent contractor, for defective or faulty workmanship, lost or stolen property or damage to property, unless the employe authorizes the employer in writing to make that deduction or unless the employer and a representa-tive designated by the employe determine that the defective or faulty workmanship, loss, theft or damage is due to the employe's negligence, carelessness, or wilful and intentional conduct, or unless the employe is found guilty or held liable in a court of competent jurisdiction by reason of that negligence, carelessness, or wilful and intentional conduct. If any deduction is made or credit taken by any employer that is not in accordance with this section, the employer shall be liable for twice the amount of the deduction or credit taken in a civil action brought by the employe. Any agree-ment entered into between an employer and employe that is contrary to this section shall be void. In case of a disagreement between the 2 parties, the department shall be the 3rd determining party, subject to any appeal to the court. Section 111.322 (2m) applies to discharge and other discriminatory acts arising in con-nection with any proceeding to recover a deduction under this section.

may discharge an employee 'for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong.' " *Brockmeyer*, 113 Wis. 2d at 567 (citations omitted). The parties agree that Mohr was an at-will employee and that his employment with BP was terminable at will, without cause, by either BP or him. With this agreement, our inquiry turns to whether Mohr's termination falls within the public policy exception to the at-will employment doctrine. Specifically, we must determine whether the public policy exception includes cases where, as here, an employee is terminated as a result of a dispute over the reimbursement of travel expenses previously paid by an employer.

¶ 12. *Brockmeyer* is the first decision to recognize the public policy exception to the at-will employment doctrine in Wisconsin. The *Brockmeyer* court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Id.* at 573. In *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 396 N.W.2d 167 (1986), the court clarified that in order to maintain a claim under the public policy exception, the discharge must result from an employee's "refusing a command to violate a public policy as established by a statutory or constitutional provision." *Id.* at 141.

¶ 13. Additionally, the *Bushko* court recognized that the public policy exception had effectively been extended "to include the spirit, as well as the clear language of a statutory provision." *Id.* at 143 (citing *Wandry*, 129 Wis. 2d at 37). This narrow exception to the at-will employment doctrine was later extended to

include fundamental and well-defined public policies based on administrative rules. *See Winkelman*, 168 Wis. 2d at 22–23. Another extension came in *Hausman v. St. Croix Care Center*, 214 Wis. 2d 655, 571 N.W.2d 393 (1997), where the court recognized: "Where the law imposes an affirmative obligation upon an employee to prevent abuse or neglect of nursing home residents and the employee fulfills that obligation by reporting the abuse, an employer's termination of employment for fulfillment of the legal obligation exposes the employer to a wrongful termination action." *Id.* at 669.

¶ 14.  To summarize, the public policy exception to the at-will employment doctrine is a very narrow exception indeed—covering an employee's refusal to obey his or her employer's command to violate public policy as established by: (1) statutory or constitutional provision, (2) the spirit of a statutory provision or (3) administrative rules. The exception further covers employees such as those in *Hausman* who are guided by an affirmative obligation to prevent abuse or neglect of nursing home residents and report employer conduct that is inconsistent with their obligation.

¶ 15.  In *Wandry,* an employee of a credit union cashed a payroll check after obtaining her supervisor's approval. *See Wandry*, 129 Wis. 2d at 39. The check had been stolen, the endorsement forged, and when the issuer of the check stopped payment, the credit union suffered a loss. *See id.* The employee was discharged when she refused to pay the credit union the total amount of the loss. *See id.* at 40. In concluding that the employee's complaint stated a cause of action for wrongful discharge, the supreme court held that:

> [S]ec. 103.455 articulates a fundamental and well-defined public policy proscribing economic coercion

by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's carelessness, negligence, or wilful misconduct.

*Id.* at 47.

¶ 16. While acknowledging that the supreme court found that WIS. STAT. § 103.455 contains a "fundamental and well-defined public policy" exception to the employment-at-will doctrine, BP contends that it does not apply when an employer is requesting that an employee repay commissions and expenses the employer believes it paid out by mistake. BP maintains that the statute is limited to employers taking deductions for "defective or faulty workmanship, lost or stolen property or damage to property" and does not cover overpayment of commissions or expenses. BP seeks to avoid § 103.455 by reasoning that because it accepted full responsibility for the overpayment and the overpayment was not a work-related loss but an administrative foul-up, its attempts to secure repayment from Mohr do not amount to the economic coercion proscribed by the statute.

¶ 17. BP is wrong. The spirit of the statute is the legislature's intention of ensuring that employees do not unfairly bear the employer's costs of operating a business. *See Erdman v. Jovoco, Inc.*, 181 Wis. 2d 736, 752, 512 N.W.2d 487 (1994). Although *Erdman* is not a wrongful discharge case, it is enlightening on the spirit of the statute. Erdman had been a manager of a convenience store owned by Jovoco. His compensation consisted of a fixed base salary and a commission based on a percentage of the store's monthly sales. *See id.* at 745. The company had a policy that permitted it to

make deductions from commissions for losses incurred whether or not Erdman was in the store.[4] *See id.* at 745–47.

¶ 18. Erdman commenced an action to recover all of the deductions made during the course of his employment; Jovoco defended on the theory that the statute was to be narrowly construed and only applied to wages paid by the hour. In concluding that WIS. STAT. § 103.455 applies to commissions earned by an employee, the supreme court explained:

> The objective of the statute is violated either by an employer who requires an employe to be bound by deductions before any claimed loss or indebtedness arises or by an employer who requires an employe to agree to the deductions and release all claims as a condition for receiving compensation, without giving the employe an opportunity to challenge the deductions.

*Erdman*, 181 Wis. 2d at 769. We conclude that the exception to the employment-at-will doctrine found in § 103.455 prohibits an employer from using its coercive economic power to shift the burden of operating its business to the employee, including the employer's overpayment of travel expenses or wages.[5]

---

[4] In one instance, the employer was clearly responsible for the losses suffered from stolen merchandise. Jovoco made deductions from Erdman's commissions for the theft of inventory which Jovoco required Erdman to store outside. Erdman repeatedly complained to Jovoco that the inventory was not secure, but Jovoco refused to spend the money for additional security or storage space. *See Erdman v. Jovoco, Inc.*, 181 Wis. 2d 736, 747, 512 N.W.2d 487 (1994).

[5] Contrary to BP's assertion, an employer is not powerless to recover overpayments to employees.

¶ 19.   We now will consider whether there is any evidence to support the jury's verdict that Mohr was discharged in violation of the fundamental and well-defined public policy found in WIS. STAT. § 103.455. We will search the record for any credible evidence that BP discharged Mohr after he refused to bow to its superior economic power and waive his statutory right to contest its demand that he reimburse it for travel expenses.

¶ 20.   The bulk of the reimbursement BP sought was for expense checks it claims were erroneously issued to Mohr between January 1, 1995, and April 30, 1996. However, in our independent review of the record we find credible evidence to support the jury's conclusion that the expense checks were appropriately issued to Mohr.

¶ 21.   In August 1994, Mohr transferred from being a store manager to being a commercial sales specialist. When the job change was made, BP provided a compensation plan that included a commission package based on the gross profits on all sales and a guaranteed base salary as a draw. The package included fourteen percent commission of gross sales plus two percent to cover Mohr's expenses. When Mohr switched jobs, Lawrence Stephens was BP's regional sales manager. As a result of the job change, BP issued a "Personnel Action Notice" that directed Mohr to see

---

If the employer is to make deductions, it may do so only in accord with one of the means provided by the statute: 1) The employe must authorize the deduction in writing; 2) there must be a mutual determination by the employer and a person representing the employe that the faulty work, loss or theft was caused by the employe's carelessness, negligence, wilful or intentional misconduct, or 3) the employe must be found guilty or liable for the loss by a court of competent jurisdiction.

*Erdman*, 181 Wis. 2d at 768.

Stephens about pay and expenses. Stephens testified that he was told by BP's president that because Mohr was to use his own vehicle for all sales calls, BP would reimburse Mohr his mileage. Stephens directed Mohr to complete a weekly expense report listing his daily mileage and to submit it to accounting.

¶ 22. Our search of the record finds credible evidence from which the jury could conclude that BP was using its superior economic position to extract a concession from Mohr that he had been improperly reimbursed for travel expenses. The evidence also supports the conclusion that BP was using its superior economic position to block Mohr's attempt to exercise his rights granted by WIS. STAT. § 103.455.

¶ 23. In April 1996, management for BP informed Mohr that it had made a mistake and he had been overpaid on his expenses. Mohr was called into the corporate office and management requested that he sign a note agreeing to the deduction of the overpayments from future commissions. Mohr asked for some time to think over BP's assertion that he had been overpaid and responded a short time later with a letter denying that he had been overpaid. Shortly thereafter, Mohr had a phone conversation with BP's president who demanded that Mohr reimburse BP. During the conversation, BP's president said, "[Y]ou are either going to agree to pay this money back to me, or then you are going to quit, and then I am going to sue you."

¶ 24. Mohr and BP's president had a second phone conversation in which the president said he had put together a note for Mohr to sign to cover the reimbursement of the expenses. Mohr responded that he did not owe BP the money, and that if BP wanted to change the expense reimbursement program in the future, he was willing to talk about a change. Mohr refused to

sign the note because the terms would have left him unable to support his family. Mohr responded to this conversation with a June 14, 1996 letter written by his attorney rejecting the request that he repay BP. In the letter, Mohr proposed that BP abandon its attempt to collect the overpayment, that all parties sign general releases and that a new compensation package be adopted.

¶ 25. Finally, there is credible evidence that BP discharged Mohr contrary to its assertion that Mohr voluntarily terminated his employment when BP did not respond to his letter of June 14, 1996. After sending the letter, Mohr waited for some type of a response from BP. When that response was not forthcoming, he reported for work on July 1, 1996. Mohr testified as to what happened: "I was to call the store manager's office, that he didn't think I was working there anymore, and I found out I was not working there anymore." The jury rejected BP's assertion that Mohr voluntarily quit and concluded that BP discharged Mohr.

¶ 26. We conclude that there is sufficient credible evidence to support the jury's verdict that BP discharged Mohr because of his refusal to repay travel expenses he received for the use of his own vehicle as a commercial sales specialist. Further, the discharge of Mohr was contrary to the public policy expressed in WIS. STAT. § 103.455, prohibiting an employer from using its coercive economic power to shift the burden of operating its business onto the shoulders of an employee.

## 2. Settlement Offer

¶ 27. Within the time dictates of WIS. STAT. § 807.01(3), Mohr served an offer of settlement offering "to settle any and all counterclaims which he may have against Plaintiff . . . in exchange for the Payment . . . of the sum of $30,000, costs included." At the time the offer was made, Mohr was pursuing three separate claims against BP including (1) unpaid wages under WIS. STAT. ch. 109, (2) wrongful discharge and (3) breach of employment contract. After approving the jury's verdict, the trial court awarded Mohr double his taxable costs and interest.

¶ 28. BP challenges this award. It contends that the three claims are distinctly different in the remedies available and the proof requirements. BP argues that "for a statutory offer of settlement to be valid, it must offer to settle each of the claims for an amount certain so that [BP] would have had an opportunity to evaluate the claims independently to determine whether to settle one or more of them." BP relies upon several decisions where the plaintiff had asserted two or more theories of liability against two or more defendants and made aggregate offers of settlement.[6] In each of those decisions, we held that the offer was invalid because the offerees were unable to analyze such an aggregate offer under each theory of liability.

¶ 29. We have developed a standard to determine the validity of an offer of settlement or offer of judgment for purposes of invoking the double costs and interest provisions of WIS. STAT. § 807.01. In order for

---

[6] See Smith v. Keller, 151 Wis. 2d 264, 444 N.W.2d 396 (Ct. App. 1989); Wilbur v. Fuchs, 158 Wis. 2d 158, 461 N.W.2d 803 ( Ct. App. 1990); D'Huyvetter v. A.O. Smith Harvestore Prods., 164 Wis. 2d 306, 475 N.W.2d 587 (Ct. App. 1991).

the offer to be effective, the offeree must be able to fully and fairly evaluate the offer from his or her own independent perspective. *See Wilber v. Fuchs*, 158 Wis. 2d 158, 165, 461 N.W.2d 803 (Ct. App. 1990). Under this standard, separate offers of settlement are only required when a plaintiff is suing multiple defendants on multiple theories, of which at least one involves several liability. *See Smith v. Keller*, 151 Wis. 2d 264, 276, 444 N.W.2d 396 (Ct. App. 1989).

¶ 30.  Under this standard, Mohr made a valid offer of settlement. He counterclaimed against a single plaintiff, BP. Although he prosecuted different causes of action having different proof requirements, there was nothing complicated about his counterclaim that prevented BP from evaluating his counterclaim. We are unwilling to reinterpret the decisions BP relies upon to require a party with multiple claims against a single party to itemize an offer of settlement made under WIS. STAT. § 807.01. As applied, the standard continues to promote the purpose of § 807.01, which is to encourage settlement and, accordingly, secure just, speedy and inexpensive determinations of disputes. *See Prosser v. Leuck*, 225 Wis. 2d 126, 140, 592 N.W.2d 178 (1999).

*By the Court.*—Judgment affirmed.